**Reverend Leon HOWARD et al., Plaintiffs-Appellants-Cross-Appellees,**

v.

**ADAMS COUNTY BOARD OF SUPERVISORS et al., Defendants-Appellees-Cross-Appellants.**

No. 72–2596.

United States Court of Appeals, Fifth Circuit.

July 2, 1973.

Rehearing and Rehearing En Banc Denied Aug. 15, 1973.

Frank R. Parker, George P. Taylor, Jackson, Miss., for plaintiffs-appellants.

Lucien C. Gwin, Jr., Lucien C. Gwin, Natchez, Miss., for defendants-appellees.

Before WISDOM, GEWIN and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

One wing of this appeal is an attempted re-run of the decision of this Court in Howard v. Adams County Board of Supervisors, 5 Cir., 1972, 453 F.2d 455, cert. denied, 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812. That case dealt in depth with the contention there raised, and now

sought to be raised anew, that the districts for the election of county supervisors in Adams County, Mississippi had been racially gerrymanded and had resulted in an impermissible dilution of the black vote for the election of supervisors in that County.

The present controversy centers upon a court ordered and court approved redistricting of Adams County dated November 26, 1971. Appellants contend that the November 26, 1971 plan (1) resulted in malapportionment of the districts and (2) dilutes the black vote for the election of supervisors. We find no merit in the first contention and the second was settled by our prior decision, Howard v. Adams County Board of Supervisors, *supra*. Accordingly, the judgment of the District Court is affirmed. Defendants-appellees have cross-appealed the order for new elections in the reconstituted districts. We also affirm the judgment in this respect.

The division of Adams County into five districts of substantially equal population for the election of county supervisors is beset by special obstacles. On its western side, the County borders the Mississippi river. Half the population of the County lives in the City of Natchez. An extensive swamp in the southwestern section of the County, a National Forest in the eastern section, and other large uninhabited areas in the County, raise additional difficulties.

Divided absolutely equally the population of each district would be 7458. It is immediately apparent, therefore, that while county supervisors have no jurisdiction over the construction and maintenance of city streets and do have exclusive jurisdiction of such activities in regard to county roads, a five way split in county population dictated that in some manner most, if not all, districts would have to encompass some territory within the City. In the plan approved by the District Court and presently under review, the districts were drawn to fan in, out and from the City, like the spokes of a wheel. Some part of the City is included in each of the five supervisor's

districts. While this approach, from the standpoint of geographical area and roads is a long way from ideal, it did divide the population as follows:

| District | Total | Variance | Percentage of Variance |
|---|---|---|---|
| 1 | 7331 | − 127 | − 1.70% |
| 2 | 7545 | + 87 | + 1.17% |
| 3 | 7506 | + 48 | + 0.64% |
| 4 | 7465 | + 7 | + 0.09% |
| 5 | 7446 | − 12 | − 0.16% |

This means, of course, that the average deviation among the districts is less than 1% of the norm, the greatest overage being 1.17% in District 2 and the maxmum deficiency being 1.70% in District 1. Out of a total population of 37,290 people, the greatest deviation (between Districts 1 and 2) was 214.

On Friday before the case was scheduled to go to trial on the following Monday, the plaintiffs filed their proposed plan of county-district reapportionment. This plan would have divided the population of the five districts as follows:

| District | Population | Variance from Norm |
|---|---|---|
| 1 | 7415 | − 0.58% |
| 2 | 7399 | − 0.80% |
| 3 | 7440 | − 0.25% |
| 4 | 7506 | + 0.63% |
| 5 | 7533 | + 0.99% |

The variations in two of the districts were greater than those appearing in the Board plan, but less by an average of 0.60% than that proposed for the other three districts.

The plaintiffs' plan produced an overall population spread between the most populated and the least populated districts of 134 persons. This compared to a maximum spread of 214, or a difference of 0.20%, in the Board plan.

It is now argued that the trial court should have accepted this plan rather than the one submitted by the Board. It is said that this plan was made strictly from official Census units, but the population accuracy of the Board plan had also been verified by the Census Bureau.

It is said that the proposed plan more nearly conformed to pre-reapportionment district lines. It must be remembered,

however, that prior to reapportionment, according to the 1970 Census, District 1 had 13,590 people, District 4 had 15,074, District 5 had 6,064, District 3 had 1,492, and District 2 had 1,073. Districts 1 and 4 had to be reduced by about 50% while Districts 2, 3, and 5 required a radical increase, almost 700% in District 2 and nearly 600% in District 3. Therefore, any idea of substantially conforming to former district lines would border on the hopeless.

Under the plan proposed by the plaintiffs, the black population in District 3 would have been 77.07% of the district while the black population of District 4 would have been 70.44% of the district. This would have been accomplished by the division of old (pre-1970) District 4 into two predominantly black districts, the goal contended for and rejected in Howard v. Adams County Board of Supervisors, *supra*.

Moreover, District 3 would have been entirely contained within the corporate limits of the City of Natchez and would have destroyed the spokelike configuration of each of the districts, which combined rural with urban population. Under the plaintiffs' plan, the supervisor for District 3 would have had no county roads to supervise or maintain, one of the more important functions imposed by law upon members of the Boards of Supervisors.

We cannot hold that the District Court, sitting as a chancellor, abused its discretion in exercising a choice between two alternatives so clearly matched as were the plans here in issue. A net difference of ⁹⁄₁₀ of 1% in the population ratios of the two plans is simply not enough for us to substitute our opinion for that of the trial judge. Moreover, there were important considerations here such as existed in Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399. Additionally, we are of the opinion that the Court approved plan adheres to the principles enunciated in Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506.

Further pursuing the subject of dilution of the racial voting power, neither the plaintiffs nor the defendants have provided us with data as to voting strength in the various proposed districts now under review. They do give the population figures:

| District | Black | White |
|---|---|---|
| 1 | 45.6% | 54.4% |
| 2 | 40.7% | 59.3% |
| 3 | 42.3% | 57.7% |
| 4 | 77.6% | 22.4% |
| 5 | 34.1% | 65.9% |

It is to be noted that in District 4 blacks number 77.6% of the population; under the plan considered as to racial dilution in Howard v. Adams County Board of Supervisors, *supra*, blacks amounted to 67%. This was the only district in Howard which had a majority of blacks and thus able to elect a supervisor if voters voted solely upon racial considerations. It still has that majority, increased by 10% as reflected by the 1970 Census, rather than 1960. As did the Howard panel [Judges Gewin, Goldberg and Dyer] we hold that the trial court was under no duty wholly from municipal territory to erect an additional "black district", in which the supervisor would be shorn of some of his primary official functions and to that extent would be reduced to a mere figurehead. There is nothing new in the racial dilution arguments contained in this appeal. We are consequently bound by and adhere to the prior panel decision on that subject.

The defendants-appellants have cross appealed from the order requiring that an election be held to choose supervisors from the newly constituted districts. Such an election has already been ordered by a prior panel of this Court. The present panel is no more at liberty to set aside that order than to reverse the decision of the prior panel on the racial dilution issue, nothing new nor material being raised.

Affirmed on direct and cross appeals and remanded for further proceedings consistently herewith.